UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CLIFFORD A. BROWN, III

       Plaintiff,

v.                          Action No. 2:16cv476

BIMBO FOODS BAKERIES
DISTRIBUTION, LLC, f/k/a BIMBO
FOODS BAKERIES DISTRIBUTION, INC.,
a/k/a BIMBO BAKERIES USA

and

BIMBO FOOD BAKERIES, SUCCESSOR
IN INTEREST TO GEORGE WESTON
BAKERIES DISTRIBUTION, INC.,

       Defendants.

## REPORT AND RECOMMENDATION

Clifford A. Brown, III ("Brown") filed suit to reverse termination of a Distribution Agreement under which he stocked various grocery outlets along four routes with products manufactured and provided by the Defendants, Bimbo Foods Bakeries Distribution, LLC and Bimbo Food Bakeries, successor in interest to George Weston Bakeries Distribution, Inc. (collectively, "Bimbo"). Brown claims Bimbo justified the termination on pretextual grounds and that the company's management of the routes during the litigation will cause him irreparable harm. On August 12, 2016, District Judge Rebecca Beach Smith designated the undersigned magistrate judge to

1

conduct hearings and submit a recommendation for the disposition of Brown's Motion for Preliminary Injunction.[1]

The parties submitted extensive briefing, including several affidavits and exhibits. On August 29, 2016, the court received additional evidence from three witnesses and heard oral argument on the Motion.

After review, the undersigned has concluded that Brown failed to make a clear showing that he is likely to succeed on the merits of his breach of contract claim, and failed to make a clear showing that there would be irreparable harm in the absence of injunction. Accordingly, this Report recommends that Brown's Motion for Preliminary Injunction (ECF No. 3) be DENIED.

## I. PROCEDURAL AND FACTUAL HISTORY

**A.  Procedural History**

Following the termination of the Distribution Agreement, Brown filed suit in Norfolk Circuit Court on July 29, 2016, alleging that Bimbo had breached their contract. On August 2, Brown served his Complaint on Bimbo and scheduled a hearing for temporary injunctive relief the following day. Bimbo, in response to the short notice, timely removed the case to this court on August 3, 2016, before the injunction hearing was held. See Def.'s Opp. TRO 10 (ECF No. 1). The Norfolk Circuit Court

---

[1] Brown originally filed this motion as an Emergency Motion for Temporary Restraining Order. (ECF No. 3).

filings, including the Complaint, Distribution Agreement, and other related exhibits were attached to the Notice of Removal filed by Bimbo. Id.   On August 4, Brown filed a Motion for Temporary Restraining Order in this court and the matter was referred to the undersigned magistrate judge for a report and recommendation.   (ECF No. 8).   The parties submitted extensive briefing including several exhibits, declarations, and the Distribution Agreement underlying the dispute.   At a hearing on August 29, 2016, the court also heard testimony from Brown, his employee Andrew Griffin ("Griffin"), and Bimbo Regional Manager Rick Rosenbach ("Rosenbach").   The following factual findings are based upon that review of the record to date.

**B.   Factual Background**

Brown is a former Independent Operator ("IO") who purchased the rights to distribute Bimbo bakery products along four routes in the Norfolk and Newport News area.   Bimbo is a multinational baked goods manufacturer that produces many well-known brands sold in grocery stores and other retail outlets throughout the country.   Among its most popular products are Little Bites muffins, sold under the Entenmann's brand name.

Bimbo has created a network of IOs, like Brown, who enter into distribution agreements to secure the exclusive right to distribute Bimbo products in a particular geographic area, commonly referred to as "routes."   If a new retailer moves into

3

the area covered by the distribution agreement, the IO has the
exclusive right to sell products to them.   Brown has operated
routes for Bimbo and its predecessors in interest for twenty
years, but has been involved in the business of distributing
baked goods for most of his life.[2]   Brown employs drivers and
owns a fleet of delivery trucks that service his routes for him.
He testified that he typically lets his drivers handle the day-
to-day operation of their respective routes, given that they are
most familiar with the stores they service.   To that end, he
does not drive a route himself or regularly scrutinize his
drivers' orders or deliveries.[3]   Brown values his four routes at
approximately $150,000 per route.   See Pl.'s Verified Compl. ¶
11 (ECF No. 1-1, at 4).   In addition to his own valuation, Bimbo
has submitted evidence to show that there is a clearly
established formula by which it values distribution routes and
that there is an active market for the purchase and sale of the
rights to distribute Bimbo products.   See Dec. William
McLaughlin ¶¶ 29-32 (ECF No. 11) (discussing distribution route
valuation formula);   Dec. Christina Shimizu ¶¶ 1-4 (ECF No. 13)
(discussing market for distribution routes).

---

[2] Brown testified that he started working with his father, also a baked
goods distributor, when he was four years old.

[3] Brown had been delivering products to Naval Station Norfolk on
Bimbo's behalf.  However, that route is not one of the four that Brown
owns the rights to and is not involved in the instant case.

IOs make money by purchasing inventory from Bimbo and then selling it at a profit to retailers on their route. Once an IO has ordered and picked up inventory from Bimbo, it becomes the IO's property. In the past, retailers would pay IOs directly upon delivery of the products, or shortly thereafter. Some retailers, such as Costco, still operate under this system. However, many retailers – particularly grocery stores – have transitioned to a system known as Scan Based Transactions ("SBT"). An SBT retailer, instead of paying for products upon delivery, takes possession of inventory and pays the distributor as the items are purchased by consumers (i.e., when the product is scanned at the register).

As a courtesy to its IOs, Bimbo has engaged in a practice of crediting IOs' accounts with the amount due from SBT retailers once product is reported as delivered to the retailer by the IO and available for sale. Bimbo then takes possession of the IOs' receivables and collects payment from the SBT retailers directly as items are scanned at the cash register. This system allows IOs to avoid carrying the cost of inventory while it waits to be sold in the store. Bimbo also accepts returns from IOs of any product which is not sold by its expiration date. These "staled-out" products are recovered from the retailer by the IO and returned to Bimbo for credit. Bimbo and the IOs engage in a weekly settlement where the orders and

5

returns for the previous week are accounted for. Bimbo and the IOs also "true up" their account on a quarterly basis, at which point IOs' accounts are charged for delivered product that was never sold by SBT retailers or returned to Bimbo by the IO.

Because of its policy of crediting IOs upon delivery to the retailer, and accepting all returns of staled-out product, Bimbo had issues with IOs reporting inventory as delivered to a store when it was not, then returning the inventory if it staled-out. To combat this problem, Bimbo issued notice in 2014 prohibiting so-called "zero-dollar invoices," which misrepresented the location of inventory awaiting sale. Dec. William McLaughlin Ex. A (ECF No. 11-1, at 2). The same warning noted that IOs who found they had excess inventory and/or truck stock due to exceptional circumstances could request an exception to the company's policy of not accepting returns of fresh product. The following year the company issued a stronger warning, advising that falsely reporting product on an invoice as delivered to an SBT retailer would be considered fraudulent activity and grounds for termination of an IO's agreement. Specifically, the second notice warned IOs and their drivers that the company would consider a false inventory count or a false delivery ticket, and/or any similar action which resulted in credit or a payment which was not due, to be an act of fraud. Dec. William McLaughlin Ex. B (ECF No. 11-2, at 2).

The distribution process begins when IOs order inventory through Bimbo and then collect the packaged baked goods from a centralized distribution center ("Depot"). The orders are usually placed a week in advance, and the inventory is sorted and prepared for pickup by Bimbo or its agents at the Depot. When IOs arrive at the Depot, they pick up their presorted order and proceed to their routes for delivery. Orders are picked up from the Depot on the day they will be delivered. Sometimes orders are "cut" or "shorted" due to a lack of inventory on the manufacturing side of this process. There is typically no warning that an order will be cut or shorted, but any cuts are divided pro rata across all orders for the particular product. The cuts are apparently a regular occurrence, and Brown has seen his orders cut short as much as forty-five percent. See Pl.'s Reply to Def.'s Opp. TRO Ex. C (ECF No. 17-1, at 14-31). According to Bimbo Regional Manager Rick Rosenbach, these cuts and shorts are just a normal part of the baked good business, in which the manufactured goods are perishable.

IOs use handheld computers and Bimbo software to scan, track, and manage their inventory. Among other capabilities, the handhelds allow IOs to buy and sell inventory, transfer inventory between individual stores or routes, and create delivery invoices. For example, if an IO sold 100 units of inventory to a store, they could use the handheld's buy-back

feature to reclaim 50 units and then sell those units to another store, or hold them in inventory. Brown and his drivers, however, have reported a long history of software malfunctions on these handhelds, particularly when it comes to buying back inventory to hold for sale to a different store. Pl.'s Verified Compl. ¶ 67-77 (ECF No. 1-1). Brown testified that using the buy-back feature to hold products in inventory would frequently result in inventory being randomly assigned to different stores and sometimes getting lost in the system. As a result, he stated that he had expressed an unwillingness to use the buy-back system to Bimbo managers, including Rosenbach.

Approximately a week before June 18, 2016, one of Brown's drivers, Griffin, learned that there would be a "Buy One Get One," or "BOGO," sale on Little Bites muffins at the Farm Fresh grocery stores along his route the following week. Brown and Griffin also testified Food Lion grocery stores were having a sale on Little Bites around the same time. In anticipation of the sales, Griffin ordered a large number of Little Bites muffins – nearly 1300 units.[4] The parties disagree about the volume of sales experienced in a BOGO promotion. Brown testified that, in an ordinary week, he sells around $150 worth

---

[4] Brown's Verified Complaint attributes this large, single order of Little Bites to the history of cuts to orders that Griffin experienced. See Pl.'s Verified Compl. ¶ 87 (ECF No. 1-1, at 14). According to the complaint, this large order was Griffin's best plan for meeting the demands of a BOGO sale. Id.

of Little Bites in any given store. However, when there is a BOGO, he can sell upwards of $2000. But Rosenbach testified that the BOGO promotion would not yield significantly more sales than a 50% off sale. Prior purchasing orders show that while 1300 units is a high number, it is not the largest order of Little Bites Brown or his drivers had ever made. See Pl.'s Reply to Def.'s Opp. TRO Ex. C (ECF No. 17-1, at 9-14); Dec. Cliff Brown ¶ 5 (ECF No. 17-1).

In the early morning hours of June 18, 2016, Griffin picked up his order from the Depot and proceeded along his normal delivery schedule. Griffin testified that he delivered all of his orders that day, indicating that he had done so by scanning them with his handheld computer and thereby creating a delivery invoice reporting that all 1300 units had been delivered to stores. Griffin also testified that when he arrived at Farm Fresh on that Monday, June 20, he learned that there was actually going to be a 50% off sale instead of a BOGO. Griffin called Brown that day to inform him that the BOGO was not going to occur and told Brown that he would handle the situation without providing further detail. Brown stated that he notified Bimbo Client Manager Scott Davis about the change in Farm Fresh's sale and that they should expect a large number of returns. Dec. Cliff Brown ¶ 7 (ECF No. 17-1). Griffin, citing a prohibition from Farm Fresh management on leaving products in

9

the stores' storage rooms, testified that he then removed the majority of the Little Bites he had previously delivered. In addition to the change in Farm Fresh's sale, Griffin stated that he had planned to have an extra display at one of his Food Lion stores, but that a new manager wouldn't allow it. As a result, Griffin testified that he also removed product previously delivered to Food Lion. In total, Griffin stated that he removed nearly 800 of the 1296 units of Little Bites he had delivered to stores along his route. He apparently did not inform Brown or Bimbo that he was planning to do this. Griffin kept most of the Little Bites he removed on his truck, but stored some in his home because he said there were not enough boxes to store them all safely in the vehicle.[5] He stated that his plan was to pull inventory from his home and truck whenever he needed to stock his stores with Little Bites. Griffin did not make any entry in his handheld computer to reflect the fact that the 800 units had been removed from the stores.

On June 21, Bimbo District Manager Kirk Phares ("Phares") contacted Brown about Griffin's large order of Little Bites. Brown was not initially aware of the size of Griffin's order and proceeded to look into it. He later stated that he did not think it was out of the ordinary given that the Little Bites had

---

[5] Griffin testified that to be stored safely, boxes had to be stacked ten-high, but that two of the stacks were a few boxes short.

been ordered for a BOGO promotion. Mr. Phares also travelled to the stores on Griffin's route to audit the inventory the following day. Upon arriving, he discovered that the majority of the Little Bites, which Griffin had invoiced as delivered, were not in the stores. Phares' audit prompted him to contact Brown again, this time about the fact that a large number of Little Bites reported as being delivered were not in the stores. Brown eventually contacted Griffin on Thursday, June 23, and told him that Bimbo had audited his stores and said that a large number of Little Bites he reported as delivered were not there. The conversation about Bimbo's audit prompted Griffin, who testified that he felt as though he was being accused of stealing, to collect the entire inventory of Little Bites he had on his truck and in his home and deliver it back to the Depot. Griffin left the nearly 800 units of Little Bites sitting on the loading dock of the Depot in the early hours of Friday, June 24. See Dec. Rick Rosenbach, Ex. A (ECF No. 12-1). He testified that he told the Warehouse Manager, "Lenny," that he was leaving the Little Bites on the dock so that Bimbo could account for them. At Griffin's instruction, Lenny marked the boxes with the name of the stores they had come from and instructions not to remove them. Aside from Lenny, Griffin apparently did not tell Brown or any of the Bimbo management that he was leaving the Little Bites on the loading dock.

Bimbo management found the Little Bites on the dock, but up to that point did not know why they were there. Brown met with Phares and Rosenbach at the Depot that same day and was apparently unaware Griffin had returned the Little Bites to the Depot. Griffin testified that he eventually returned to the Depot, collected the Little Bites, and redelivered them to the stores he had removed them from. Although the stores had previously not allowed him to keep such a large amount in their storage rooms, Griffin testified that he was granted an exception because of the situation and relationship he had developed with the store managers on his route.

Bimbo's audit and subsequent investigation into the incident eventually led to the decision to terminate Brown's Distribution Agreement on July 5, 2016. Bimbo's termination letter advised that Brown and Griffin engaged in fraudulent activity, which is a non-curable breach under the contract. See Distribution Agreement § 8.2 (ECF No. 1-1, at 34).[6] Specifically, Bimbo's letter stated that it was fraudulent for Griffin to report 800 of the 1296 Little Bites units as delivered when the audit revealed they were not in the stores.

---

[6] The Distribution Agreement states that, "[i]f the breach by [Brown] involves criminal activity or fraud, threatens public health or safety, or threatens to do significant harm to [Bimbo], its affiliates, it operations, its trademarks or commercial reputation [Bimbo] may terminate this Agreement immediately upon written notice and [Brown] shall have no right to cure."

Bimbo also cited the fact that the Little Bites were being stored in Griffin's home where they could not be sold to consumers. Both Brown and Griffin testified that there was no intent to defraud Bimbo and that, given the account reconciliation procedures in place, there is no way they could have financially profited from their conduct. Bimbo, however, maintains that these actions violated the "zero-dollar ticket" policy that had been distributed to IOs at the Depot. These policies were apparently posted on two bulletin boards in the Depot and distributed to IOs through an internal mail system. Griffin testified he was aware of where the bulletin boards were, but had not seen either posting.

Pursuant to the Distribution Agreement, Bimbo has been operating Brown's routes since the termination of his contract.[7] Brown testified that his routes typically generated seven to eight-thousand dollars in weekly revenue. He also testified that since Bimbo took over management of the routes they are operating at a sixteen-thousand dollar loss. Additionally, Brown says he has received thirty-five complaints from his retail stores concerning how the accounts are now being handled. Brown contends that if allowed to continue, Bimbo will

---

[7] Section 8.4 of the Distribution Agreement states that, in the event of termination, Bimbo will operate Brown's account and that Brown has ninety days to sell his distribution rights before Bimbo is permitted to sell them unilaterally. See Distribution Agreement § 8.4 (ECF No. 1-1, at 35).

irreparably harm the business he has created over the past twenty years by destroying the goodwill he has garnered from his clients.   Unless Brown's Motion for Preliminary Injunction is granted or the parties reach a separate agreement, Bimbo will be permitted to sell Brown's distribution rights on October 3, 2016.

After review of the evidence presented, I conclude that Brown has not met his burden of showing a clear likelihood of success on the merits, or a clear likelihood of irreparable harm.   Accordingly, this Report recommends that the district court deny Brown's request for preliminary injunctive relief.

## II. STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008); Real Truth About Obama, Inc. v. Federal Election Comm'n, 575 F.3d 342, 347 (4th Cir. 2009) vacated on other grounds, 559 U.S. 1089 (2010).

As the Fourth Circuit observed, the standard articulated in Winter is "far stricter" than the old Blackwelder standard. Id. at 347 (citing Blackwelder Furniture Co. v. Seilig Manufacturing Co., 550 F.2d 189 (4th Cir. 1977)). Winter sets forth four requirements, "each of which must be satisfied as articulated." Id. at 347. The four requirements are:

(1)    a clear showing that the plaintiff will likely succeed on the merits at trial;

(2)    a clear showing that the plaintiff is likely to be irreparably harmed absent preliminary relief;

(3)    that the balance of equities tips in the plaintiff's favor; and

(4)    that an injunction is in the public interest.

Id. at 346-47.

Therefore, in order to obtain injunctive relief in the present case, Brown must satisfy each of the four requirements set forth in Winter.

### III. ANALYSIS

**1.    Brown has not made a clear showing that he is likely to succeed on the merits.**

In order to justify the extraordinary remedy of preliminary injunctive relief, Brown must clearly show that he is likely to succeed on the merits. Real Truth, 575 F. 3d at 346. In this case, those merits involve his claim that Bimbo improperly terminated his Distribution Agreement. To establish a breach of contract claim under Pennsylvania law,[8] a plaintiff must show (1) the existence of a valid contract, (2) breach of a duty imposed by the contract, and (3) damages resulting from the breach. See

---

[8] The Distribution Agreement sets out, and the parties do not dispute, that any claims arising out of the contract will be governed by the laws of the Commonwealth of Pennsylvania. Distribution Agreement § 11.8 (ECF No. 1-1, at 39).

15

Sewer Auth. Of Scranton v. Pa. Infrastructure Inv. Auth. of Commonwealth, 81 A.3d 1031, 1041-42 (Pa. Commw. Ct. 2013). Neither party disputes the validity of the Distribution Agreement. There is, however, a dispute over whether the agreement was properly terminated pursuant to the "non-curable" breach provision of the contract.

Section 8.2 of the Distribution Agreement states that, "[i]f the breach by DISTRIBUTOR involves criminal activity or fraud . . . [Bimbo] may terminate this Agreement immediately upon written notice and DISTRIBUTOR shall have no right to cure." See (ECF No. 1-1, at 34-35). Bimbo has alleged that Brown, through his driver Griffin, engaged in fraudulent activity when inventory invoiced as delivered to SBT retailers was not found in the stores it was supposedly delivered to. Griffin testified that he had delivered all of the inventory,[9]

---

[9] On September 8, 2016, Brown filed a motion requesting leave to file a supplemental affidavit completed by Roger Saunders, an employee at one of the Farm Fresh grocery stores on Griffin's route. (ECF No. 23-1). Bimbo has not yet responded to Brown's Motion, however, the court can address the issue without further briefing. Mr. Saunders states that he personally observed Griffin deliver a large number of Little Bites muffins - "an additional 3 stacks" - on June 18, 2016. Id. at ¶ 5. This new evidence bolsters Griffin's testimony that he delivered and then removed the 800 units of Little Bites muffins from the stores along his route. However, the evidence does not alter the court's analysis or recommendation. Indeed, even if Griffin's account was undisputed, there would still be a factual question of whether reporting inventory as delivered and then removing it without notifying Bimbo constitutes fraud. In addition, Saunders' testimony does not alter this report's conclusion that Brown has failed to clearly demonstrate irreparable harm.

but later removed approximately 800 of the 1296 units of Little Bites muffins from the stores on his route and was holding them in his delivery truck and home.  He stated the change to his delivery and invoicing plan arose after he learned that a scheduled BOGO sale would be replaced by 50% off pricing.  Brown and Griffin maintain that there was no intent to defraud Bimbo, that Griffin's actions were warranted under the circumstances, and that Bimbo's policies on "zero-dollar tickets" cannot modify the Distribution Contract to define fraud.  Further, Brown alleges that the reasons offered for the termination of his Distribution Agreement were pretextual — that a personal grudge between Griffin and Rick Rosenbach is the real reason his contract was terminated.

Rosenbach, who was called as an adverse witness, was unable to directly contradict Griffin's testimony that he initially delivered all of the inventory, but he did testify that he did not believe Farm Fresh's change from a BOGO to a 50% off sale would explain Griffin's decision to remove 75% of his delivered order.  Rosenbach introduced pictures showing the volume of product Griffin had returned to the depot and compared them with the small number of boxes found in the stores during Bimbo's audit.  He also testified that neither Griffin nor Brown had asked for an exception to the "no fresh returns" policy in order

to return some of the product. They also did not offer it for sale to another IO.

At this stage of the proceedings it does not matter whether the zero-dollar ticket policy actually modified the language of the contract because the contract already permitted immediate termination for fraud. It is also not disputed that on one of Brown's routes – the one managed by Griffin – a large portion of Little Bites inventory which had been invoiced and reported as delivered to SBT retailers was not found in the stores on that route. And a policy distributed to IOs more than a year earlier had specifically warned that Bimbo would consider "false inventory counts" to SBT retailers to be "an act of fraud," and grounds for termination. The court need not – and does not – now decide whether Griffin's actions actually constituted fraud, but the existence of such a substantial factual dispute on this question is enough to conclude that Brown has not met his burden of clearly showing a likelihood of success on the merits. See Ramsey v. Bimbo Foods Bakeries Distribution, Inc., No. 5:14-CV-26-BR, 2014 WL 3408585, at *8 (E.D.N.C. July 10, 2014) ("Because there is a factual dispute as to whether plaintiff breached the Distribution Agreement . . . plaintiff has not clearly shown that he will likely succeed on the merits of his breach of contract claim"); see also Wellin v. Wellin, No. 2:13-CV-1831-DCN, 2013 WL 6175829, at *4 (D.S.C. Nov. 22, 2013); Torres

_Advanced Enter. Solutions LLC v. Mid-Atl. Prof'ls Inc._, No. PWG-12-3679, 2013 WL 531215, at *3 (D. Md. Feb. 8, 2013). Because there is a substantial factual dispute about whether Griffin's actions constituted fraud, Brown has failed to make a clear showing that he is likely to succeed on the merits of his breach of contract claim.

## 2.  Brown has not made a clear showing of irreparable harm.

Brown has also failed to make a clear showing that he will suffer irreparable harm if preliminary injunctive relief is denied.  "Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate. Thus, when the record indicates that [plaintiff's loss] is a matter of simple mathematic calculation, a plaintiff fails to establish irreparable injury for preliminary injunction purposes."  _Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co._, 22 F.3d 546, 551-52 (4th Cir. 1994) (internal quotation marks and citations omitted) (alteration in original).  But in _Multi-Channel_, the Fourth Circuit also recognized that loss of goodwill may satisfy the irreparable harm requirement.  _See id._ at 552 ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.").  But each case for injunctive relief must be examined on its own facts.  Especially

in light of <u>Winter</u>, there still must be a clear showing here that monetary damages are incalculable, or that damage to goodwill would make monetary relief difficult to ascertain or inadequate.  See <u>Ramsey</u>, 2014 WL 3408585 at *9.

In this case, both parties risk the loss of goodwill.  The IOs, as the distributors of Bimbo products, serve an important function in maintaining timely, accurate deliveries and ensuring that retailers' inventory needs are met.  But the product they sell - name-brand baked goods - carries significant goodwill created by Bimbo and its brand managers.  In fact, Rosenbach - a Bimbo employee - testified that the primary driver of Bimbo sales is position and shelf-space in the retail markets, which both Bimbo and the IOs actively cultivate.  Because the goodwill associated with Bimbo's brands is a significant driver of sales, there is a mathematical formula, historical sales data, and market data that make calculating monetary damages for the loss of Brown's routes possible.  Indeed, Bimbo has identified a formula that is frequently used to calculate the value of any given distribution route, accounting for 52-week sales averages and geographic location.[10]  Brown himself recognizes that his

---

[10] Bimbo measures the value of a distribution route by taking the previous 52-weeks' average net sales revenue and multiplying it by 15 for brand-name product and by 5 for restaurant, institutional, or private label product.  This formula is used for all Bimbo distribution routes, but the multiples are specific to the Hampton Roads area.  See Dec. William McLaughlin ¶¶ 30-32 (ECF No. 11).

routes have a well understood market value based on his past performance.

Despite assigning a total value of $600,000 to his four routes, Brown argues that Bimbo's formula cannot account for the time Bimbo has managed his routes, including the conditions of the routes under Bimbo's management and any effect those conditions may have on present and future sales. In other words, Brown contends that Bimbo is causing an incalculable amount of damage to his routes through mismanagement, either because the retailers will revoke shelf-space or customers will turn to a competitor's product.

It is clear, however, that any change in revenue or profitability from the time Bimbo assumed control of Brown's routes can be tracked and accounted for by comparing the financial data from the time Brown operated the routes with the data from Bimbo's management. Brown himself testified to an exact amount - $16,000 - that his routes had allegedly lost under Bimbo's management. Even without the benefit of historical sales data, comparison data could be drawn from a ready-market for the sale and purchase of distribution rights.

Although Multi-Channel acknowledges that the loss of customers or goodwill may be difficult to value, the business in that case - cable TV service - is quite different than the baked goods distributed by Bimbo. The court's finding in Multi-

21

Channel was based in large part on the great variety in the cable subscriptions selected by individual customers.   Multi-Channel, 22 F.3d at 552.   Moreover, a customer's goodwill towards their TV service provider is arguably more focused on how the product is delivered rather than what the product is. And once a customer has committed to a single provider, they are no longer in the market for that service.   Id. ("[T]he threat of a permanent loss of customer . . . support[s] a finding of irreparable harm.").

In contrast, a person shopping for baked goods in a grocery store is focused on what product they are buying, and less concerned with how that product was delivered.   These consumers are making short-term decisions about what to stock in their pantry each week.   If their favorite package of Little Bites is missing from the shelves, it does not follow that they will never purchase that product again.   It is possible that unreliable distribution could negatively impact relationships with retailers — leading to loss of shelf-space or in-store displays — but the evidence in the case to date would not support that conclusion.   Finally, the rights conferred by the Distribution Agreement are the rights to sell Bimbo products to the retailer on their route.   Those rights will remain with Bimbo and subject to the court's power to order relief after trial.

On the record before the court, there is no clear showing that any decline in sales on Brown's routes has caused him irreparable harm.    Brown's pleadings and testimony make it apparent that a dollar value can be assigned to his routes, and there is no suggestion that Bimbo would be unable to answer any damages claim shown by the evidence.    Accordingly, because the evidence submitted to date by both Brown and Bimbo suggests that any damages resulting from the alleged breach of contract could be calculated from readily accessible data, Brown has failed to meet his burden of clearly showing irreparable harm.

3.    **The balance of the equities may tip towards Brown, but the equities are insufficient to warrant injunctive relief.**

When determining the balance of equities, courts "must balance the competing claims of injury" and "consider the effect on each party of the granting or withholding" injunctive relief. Winter, 555 U.S. at 24.    The evidence presented at the hearing in this case and by exhibits suggests that the balance of the equities would favor injunctive relief.    Nevertheless, because Real Truth requires that the moving party satisfy all four elements of the Winter standard for injunctive relief, and Brown has failed to meet either of the first two, this Report recommends denying injunctive relief.

Brown appears to have been a stable and valued member of Bimbo's distribution network for many years. He has, quite literally, dedicated his life to the baked goods delivery business and found success doing so. The relationship between Bimbo and Brown has been financially advantageous for both parties. Bimbo's decision to end that relationship will have a substantial financial impact on Brown and his employees.

The court may eventually find that Griffin's actions misrepresenting the status of his SBT inventory constituted fraud. If so, Bimbo would be within its contractual rights to terminate the Distribution Agreement. But, when balancing equities, it is hard to ignore the fact that the fraud, if it occurred, would have had minimal financial impact on Bimbo. Indeed, regardless of how Griffin's actions are labeled, Bimbo had not yet incurred financial damage because of them – the inventory at issue was not lost or returned as stale, and was still available for sale. Moreover, while denying injunctive relief will clearly have a negative impact on Brown, granting injunctive relief would be only minimally disruptive to Bimbo financially, given the current status of Brown's routes and his personal ability to service them. In light of the factual dispute over whether Griffin's actions constituted incurable fraud, the equities weigh in favor of granting injunctive relief.

Denying injunctive relief may also create circumstances that limit the available remedies. Under the Distribution Agreement, Bimbo will be able to sell Brown's routes on October 3, 2016, unless injunctive relief is granted or Brown sells the routes himself. Postponing the sale would have little to no effect on Bimbo. The cost of maintaining a distribution route can be covered by the marginal profit generated from selling Bimbo's products and the Distribution Agreement allows Bimbo to retain the costs of operating Brown's routes during the process of termination.

Despite the equities favoring injunctive relief, the standard followed in the Fourth Circuit under Real Truth and Winter mandates denial because two of the factors are unmet. For decades prior to Winter, the standard for granting a preliminary injunction in this Circuit was known as the "balance-of-hardship test" or the "Blackwelder standard," from the Fourth Circuit case of Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co., 550 F.2d 189 (4th Cir. 1977), which first articulated the test. Under Blackwelder, courts were required to balance "the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied," against "the likelihood of harm to the defendant if the requested relief is granted." 550 F.2d 189, 195 (4th Cir. 1977). If this weighing of the hardships tipped strongly toward

the plaintiff, it was not necessary for the plaintiff to show a likelihood of success on the merits, but only that "grave or serious questions are presented." Id. at 196. Blackwelder contemplated a "flexible interplay" between the factors. Id. (noting that all four factors "are intertwined and each affects in degree all the others").

But, as the Fourth Circuit observed in Real Truth, the standard articulated in Winter is "far stricter" than the Blackwelder standard. Real Truth, 575 F.3d at 347. And the interpretation of Winter adopted by the Fourth Circuit in Real Truth requires that all four requirements "must be satisfied as articulated" in order to warrant injunctive relief. Id. at 347.[11]  Because Brown has failed to satisfy two of the prerequisites to injunctive relief, it should not be granted.

## 4.   The public interest in this case does not strongly favor granting or denying injunctive relief.

Finally, in deciding whether to grant preliminary injunctive relief, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24 (citing Amoco Production Co. v. Village of Gambell, AK, 480 U.S. 531, 542 (1987)) (internal quotations omitted).   Courts

---

[11] Not every Circuit has read Winter to preclude the more flexible approach previously followed under Blackwelder. See, e.g., Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35-38 (2d Cir. 2010).

recognize that the public interest is served by enforcement of valid contractual obligations. See, e.g., NaturaLawn of America, Inc. v. West Group, LLC, 484 F. Supp. 2d 392, 404 (D. Md. Apr. 22, 2007) ("It is in the public interest to . . . enforce valid contracts."); see also Ramsey, No. 5:14-CV-26-BR, 2014 WL at *4.

Brown has not made a clear showing of likelihood of success on the merits. As a result, the public interest favoring enforcement of valid contractual rights would not favor injunctive relief. But Brown's business and his employees' lives are likely to be permanently disrupted by Bimbo's assertion of contractual rights which are not yet clearly established. These private rights, however, are primarily considered in the other three factors of Winter. Moreover, as Brown has failed to satisfy the first two prongs of Winter, the court will not recommend that a preliminary injunction be issued in this case.

## IV.   RECOMMENDATION

For the foregoing reasons, the court recommends that the Motion for Preliminary Injunction (ECF No. 3) be DENIED.

## V.   REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

September 13, 2016