UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CLIFFORD A. BROWN, III

       Plaintiff,

v.                                  Action No. 2:16cv476

BIMBO FOODS BAKERIES DISTRIBUTION,
LLC, f/k/a BIMBO FOODS BAKERIES
DISTRIBUTION, INC., a/k/a
BIMBO BAKERIES USA AND
BIMBO FOOD BAKERIES,
SUCCESSOR IN INTEREST TO
GEORGE WESTON BAKERIES
DISTRIBUTION, INC.,

       Defendant.

## REPORT AND RECOMMENDATION

    This matter is before the court on Defendant Bimbo Foods Bakeries Distribution, LLC, f/k/a Bimbo Foods Bakeries Distribution, Inc., f/k/a George Weston Bakeries Distribution, Inc. (collectively "Bimbo")'s Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 15). Bimbo claims that Count I of Plaintiff Clifford A. Brown, III ("Brown")'s Complaint – seeking specific performance of his Distribution Agreement with Bimbo – should be dismissed because it is not an independent cause of action. Bimbo also argues that any request for the remedy of specific performance should be dismissed because it is not available under Pennsylvania law under the

1

facts alleged.[1]  On September 15, 2016, the motion was referred
to the undersigned United States Magistrate Judge for a report
and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C),
and Rule 72 of the Federal Rules of Civil Procedure.  For the
reasons stated below, the undersigned recommends that the
district court DENY Bimbo's Motion to Dismiss.

## I. FACTUAL BACKGROUND

### A.  Brown's Relationship with Bimbo

Brown is a former Independent Operator ("IO") who purchased
the rights to distribute Bimbo bakery products along four routes
in the Norfolk and Newport News area.  Verified Compl. ¶¶ 1-3
(ECF No. 1-1).  Bimbo is a multinational baked goods
manufacturer that produces many well-known brands sold in
grocery stores and other retail outlets throughout the country.
Id. at ¶¶ 12-14.  Among its most popular products are Little
Bites muffins, sold under the Entenmann's brand name.  Id. at ¶
13.

Bimbo has created a network of IOs, like Brown, who enter
into distribution agreements to secure the exclusive right to
distribute Bimbo products in a particular geographic area,
commonly referred to as "routes."  See id. at ¶¶ 19-22.  If a

---

[1] The Distribution Agreement sets out, and the parties do not dispute,
that any claims arising out of the contract will be governed by the
laws of the Commonwealth of Pennsylvania.  Distribution Agreement §
11.8 (ECF No. 1-1, at 39).

new retailer moves into the area covered by the distribution agreement, the IO has the exclusive right to sell products to them.  Id.  Brown has operated routes for Bimbo and its predecessors in interest for twenty years, but has been involved in the business of distributing baked goods for most of his life.[2]  Id. at ¶ 2.  Brown employs drivers and owns a fleet of delivery trucks that service his routes for him.  Id. at ¶ 6. Brown values his four routes at approximately $150,000 per route.  See id. at ¶ 11.  In addition to his own valuation, Bimbo has submitted evidence to show that there is an established formula by which it values distribution routes, and that there is an active market for the purchase and sale of the rights to distribute Bimbo products.  See Dec. William McLaughlin ¶¶ 29-32 (ECF No. 11) (discussing distribution route valuation formula); Dec. Christina Shimizu ¶¶ 1-4 (ECF No. 13) (discussing market for distribution routes).

Although Brown placed a current monetary value on each of his routes, he claims his routes are unique, given the effort he has put into building customer relationships and growing his business.  See Verified Compl. ¶¶ 134, 136 (ECF No. 1-1).  Brown states that he "has developed great customer relations and good will with companies . . . over the many years he has worked his

---

[2] Brown testified that he started working with his father, also a baked goods distributor, when he was four years old.

routes." Id. at ¶ 9. Brown believes that if he was forced to sell the routes now, it would deny him "extra-contractual opportunities such as the ability to expand his routes, add routes as he has historically done, and/or ultimately sell his routes at a time when he is ready to retire in a profitable and controlled manner." Id. at ¶ 139. Brown has also been offered opportunities to expand his business. According to him, he was "instrumental in establishing the Sara Lee brand in the Norfolk market" and was so successful at the business that "he was offered an opportunity to take over the Eastern Carolina sales area." Id. at ¶ 4.

B. **Termination of the Distribution Agreement**

In the week prior to June 18, 2016, one of Brown's delivery drivers, Andrew Griffin ("Griffin"), placed an order for a large number of Entenmann's Little Bites in anticipation of a "buy one, get one" or "BOGO" sale at Farm Fresh grocery stores along his delivery route. Verified Compl. ¶ 87 (ECF No. 1-1). The order was allegedly delivered to the stores on June 18, and Griffin created delivery invoices to that effect. Id. at ¶ 91. After delivering the Little Bites, Griffin learned that the BOGO had been changed to a 50 percent-off sale, which would apparently result in far less sales. Id. at ¶¶ 93-95. In response to the sale change, Griffin testified that he removed approximately 800 of the 1296 units he had delivered because the

4

grocery store managers prohibited him from leaving excess inventory in the stores' storage rooms. See also id. at ¶ 101. According to Griffin, his plan was to store them in his truck and home until he needed to restock the stores on his route. See id. at ¶¶ 102-03.

When Bimbo District Manager Kirk Phares ("Phares") learned of Griffin's order, he conducted an audit of the stores on Griffin's route. The audit revealed that a substantial number of Little Bites were not in the stores despite being invoiced as delivered. This audit occurred two days after Griffin claims he removed the inventory. Because IOs receive immediate credit when inventory is delivered to certain retailers, Bimbo considered any false inventory reports to be an act of fraud and grounds for termination.

Bimbo's audit and subsequent investigation into the incident eventually led to the decision to terminate Brown's Distribution Agreement on July 5, 2016. Bimbo's termination letter advised that Brown and Griffin engaged in fraudulent activity, which is a non-curable breach under the contract. See Distribution Agreement § 8.2 (ECF No. 1-1, at 34).[3]

---

[3] The Distribution Agreement states that, "[i]f the breach by [Brown] involves criminal activity or fraud, threatens public health or safety, or threatens to do significant harm to [Bimbo], its affiliates, it operations, its trademarks or commercial reputation [Bimbo] may terminate this Agreement immediately upon written notice and [Brown] shall have no right to cure."

Specifically, Bimbo's letter stated that it was fraudulent for Griffin to report 800 of the 1296 Little Bites units as delivered when the audit revealed they were not in the stores. Bimbo also cited the fact that the Little Bites were being stored in Griffin's home where they could not be sold to consumers. Bimbo maintains that these actions violated its policy prohibiting false inventory counts which had been distributed to IOs at Bimbo's distribution center (the "Depot"). The policies were apparently posted on two bulletin boards in the Depot and circulated to IOs through an internal mail system. Griffin testified he was aware of where the bulletin boards were, but had not seen either posting.

Pursuant to the Distribution Agreement, Bimbo has been operating Brown's routes since the termination of his contract.[4] Brown testified that his routes typically generated seven to eight-thousand dollars in weekly revenue. He also testified that since Bimbo took over management of the routes they are operating at a sixteen-thousand dollar loss. Additionally, Brown says he has received thirty-five complaints from his retail stores concerning how the accounts are now being handled. Brown contends that if allowed to continue, Bimbo will

_____

[4] Section 8.4 of the Distribution Agreement states that, in the event of termination, Bimbo will operate Brown's account and that Brown has ninety days to sell his distribution rights before Bimbo is permitted to sell them unilaterally. See Distribution Agreement § 8.4 (ECF No. 1-1, at 35).

6

irreparably harm the business he has created over the past twenty years by destroying the goodwill he has garnered from his clients. See Verified Compl. ¶ 124 (ECF No. 1-1). Under the terms of the Distribution Agreement, a valid termination of Brown's distribution rights requires that they be sold by Brown. If Brown fails to sell them, the Distribution Agreement empowers Bimbo to do so as of October 3, 2016.

Although Brown was unable to make the clear showing of irreparable harm required to obtain preliminary injunctive relief, his pleadings do plausibly allege entitlement to the remedy of specific performance. At this stage of the proceedings, with all inferences drawn in favor of Brown, this report recommends the court deny the Motion.

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a Complaint. "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A pleading fails to meet this standard and is subject to dismissal under Rule 12(b)(6) when it does not "contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the

7

plaintiff pleads factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  "Factual allegations must be enough to raise a right to relief above the speculative level" and beyond the level that is merely conceivable.  Twombly, 550 U.S. at 555.  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action" do not state a claim.  Iqbal, 556 U.S. at 678.

The United States Supreme Court has described the motion to dismiss analysis in two parts.  First, the court must accept the allegations of fact as true.  Id.  However, a court is not required "to accept as true a legal conclusion couched as a factual allegation," Papasan v. Allain, 478 U.S. 265, 286 (1986), or a legal conclusion unsupported by factual allegations, Iqbal, 556 U.S. at 678-79.  After reviewing the allegations, the court must then consider whether they are sufficient to state a plausible claim for relief.  This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.  A Rule 12(b)(6) motion should be granted if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling

8

him to relief." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

In addition to considering the facts alleged in the Complaint, the court may consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." Silverman v. Town of Blackstone, Va., 843 F. Supp. 2d 628, 631 (E.D. Va. 2012). "The Court may also look to documents attached to the complaint and those incorporated by reference without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment." Id.; see also Pueschel v. United States, 369 F.3d 345 (4th Cir. 2004). This includes documents attached to the Motion to Dismiss when the document "was integral to and explicitly relied on in the complaint and the plaintiff[] do[es] not challenge its authenticity." Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004) (quoting Phillips v. LCI Int'l Inc., 190 F.3d 609, 618 (4th Cir. 1999)).

It is important for the purposes of this recommendation to highlight that the standard for assessing a 12(b)(6) motion to dismiss differs significantly from the standard used to assess requests for preliminary injunction. As this court highlighted in its recommendation to deny Brown's Motion for Preliminary Injunction, "preliminary injunction is an extraordinary remedy" never awarded as of right. See (ECF No. 25 at 25). Among the

9

four prerequisites to injunctive relief in the Fourth Circuit, plaintiffs must make a clear showing of likelihood of success on the merits and of irreparable harm. <u>See</u> <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008) (requiring (1) clear showing of likelihood of success on the merits, (2) clear showing of irreparable harm, (3) favorable balance of equities, and (4) that the public interest favors injunction). In contrast, to survive a motion to dismiss, plaintiffs need only allege facts that plausibly state a claim for relief. A clear showing of success is not required here, only plausibility. With this difference in mind, the undersigned recommends the court deny Bimbo's Motion to Dismiss.

### III. <u>ANALYSIS</u>

1. **Pennsylvania Law does not preclude a Stand-Alone Claim for Specific Performance.**

Bimbo has first moved to dismiss Count I, arguing that specific performance is not a cause of action under Pennsylvania law. (ECF Nos. 15, 16). However, a review of Pennsylvania law reveals that while specific performance is understood to be an equitable <u>remedy</u>, courts do not dismiss actions for specific performance simply because they have been pled as stand-alone claims. <u>See, e.g.</u>, <u>Oliver v. Ball</u>, 136 A.3d 162, 164 (Pa. Super. Ct. 2016) ("Appellant's claim for specific performance was severed from his claim for damages and proceeded to a non-

10

jury trial."); <u>Boyd & Mahoney v. Chevron U.S.A.</u>, 419 614 A.2d 1191, 1194 (Pa. Super. Ct. 1992) ("To prevail on <u>an action for specific performance</u> . . . .") (emphasis added); <u>see also TruePosition, Inc. v. LM Ericsson Telephone Co.</u>, 977 F.Supp.2d. 462, 472 (E.D. Pa. Oct. 9, 2013) (recognizing specific performance as an equitable remedy but assessing it under 12(b)(6) standard as an independent counterclaim).  Thus it appears Pennsylvania courts will adjudicate stand-alone claims for specific performance.  In addition, Rule 8 of the Federal Rules of Civil Procedure require only "a short plain statement of the claim showing that the pleader is entitled to relief," and permits demands for "relief in the alternative or different types of relief."  Fed. R. Civ. P. 8(a)(2), (3).  Accordingly, Brown's claim for specific performance should not be denied solely on the basis that he framed it as a separate count in his pleadings.

2. **Brown's Complaint Contains Sufficient Factual Allegations, Accepted as True, to State a Plausible Claim for Specific Performance.**

Bimbo has also moved to dismiss any request for specific performance as a remedy to the breach of contract claim alleged in Count II of Brown's Complaint.  <u>See</u> (ECF Nos. 15, 16).  In order to survive a motion to dismiss, Brown was required to submit a complaint that "contain[s] sufficient factual matter, accepted as true, to 'state a claim that is plausible on its

face.'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 570). Because Count I of Brown's Complaint states a claim for specific performance and Count II seeks the same remedy, the dispositive issue here is whether, accepting Brown's factual allegations as true, specific performance of his Distribution Agreement is a plausible remedy under Pennsylvania law.[5] At this stage of the proceedings, and considering the facts pled and all reasonable inferences from those facts in favor of Brown, this court finds that it is.

Under Pennsylvania law, "[t]o prevail on an action for specific performance the [plaintiff] has the burden of showing that there is a valid agreement; that the agreement has been violated; and that the holder does not have adequate remedy at law." <u>Boyd & Mahoney</u>, 614 A.2d at 1194. A court's jurisdiction to grant specific performance "'depends upon the 'inadequacy' of the remedy at law.'" <u>Allegheny Energy, Inc. v. DQE, Inc.</u>, 171 F.3d 153, 160 (3d Cir. 1999) (quoting <u>Petry v. Tanglwood Lakes, Inc.</u>, 522 A.2d 1053, 1056 (1987)). Importantly, the mere fact that a remedy at law exists is not enough to bar specific

---

[5] Again, Pennsylvania courts acknowledge specific performance is an equitable remedy while still assessing its availability under the framework of a stand-alone claim. <u>See</u> <u>Boyd & Mahoney</u>, 614 A.2d at 1194. Accordingly, while the issue of available remedies is more properly considered during the damages phase of trial, this court assesses Count I of Brown's complaint as a stand-alone cause of action, which inferentially addresses whether specific performance might be available as a remedy to the breach of contract claim in Count II.

performance; "'the question is whether the remedy is adequate or complete.'" <u>Allegheny</u>, 171 F.3d at 160 (quoting <u>Edison Illuminating Co. v. Eastern Pa. Power Co.</u>, 98 A. 652, 655 (1916)). Monetary damages "[are] an inadequate remedy when there is no method by which the amount of damages can be accurately computed or ascertained." <u>Clark v. Pennsylvania State Police</u>, 436 A.2d 1383, 1385 (Pa. 1981). Finally, damages cannot be accurately ascertained when the subject matter of the agreement "is an asset that is unique" or one whose "equivalent cannot be purchased on the open market." <u>See</u> <u>Tomb v. Lavalle</u>, 444 A.2d 666, 668 (Pa. Super. Ct. 1981).

**A.   The Existence of a Contract and Alleged Breach Thereof**

In this case, Brown has pled facts to support the first two prongs of a claim for specific performance: (1) That a contract existed, and (2) that it was breached. <u>See</u> <u>Boyd & Mahoney</u>, 614 A.2d at 1194. Indeed, Brown's entire suit arises from Bimbo's termination of a Distribution Agreement that had been in effect for many years. Verified Compl. ¶ 3 (ECF No. 1-1).

In regard to the existence of a contract, Brown has sufficiently pled in his complaint that the Distribution Agreement exists. <u>Id.</u> In addition to the factual allegations in Brown's complaint, the Distribution Agreement itself was attached as an exhibit to the initial pleadings. Verified Compl. Ex. A (ECF No. 1-1 at 23). The Distribution Agreement

13

defines the parties, their rights and obligations, and the
nature of performance due from each.   <u>See</u> <u>Lackner v. Glosser</u>,
892 A.2d 21, 31 (Pa. Super. Ct. 2006).   Accordingly, Brown has
pled facts that, taken as true, plausibly state that a contract
between the parties exists.

Bimbo contends that, because the company terminated the
Distribution Agreement on July 5, 2016, Brown cannot meet the
first element of specific performance.   <u>See</u> Mem. Supp. Def.'s
Mot. Dismiss (ECF No. 16 at 7).   In other words, Bimbo argues
that there is no contract to be performed because its
termination letter triggered the sales provision of the
Distribution Agreement, leaving Brown with only a claim for the
net sales price from his route.   But, this argument is flawed in
several respects.   First, despite claiming that it no longer
exists, Bimbo is still operating under the Distribution
Agreement today.   Pursuant to Section 8.4 of the Distribution
Agreement, Bimbo is managing Brown's routes, and presumably
plans to sell the rights to those routes after the contractually
specified time has elapsed.   <u>See</u> (ECF No. 1-1 at 35).   Second,
contrary to Bimbo's argument, an award of specific performance
would not amount to the court "rewriting the parties' contract."
Mem. Supp. Def.'s Mot. Dismiss (ECF No. 16 at 7).   Instead, an
award of specific performance in this case would merely
reinstate the obligations of the Distribution Agreement that

14

still exists, not create a new contract. Most importantly, if Brown convinces the court that he did not commit fraud or some other incurable breach, Bimbo would have no basis to terminate its contract with Brown. And its action in attempting to terminate would instead be a breach.

Indeed, Brown has pled facts that, taken as true, plausibly state that Bimbo breached the Distribution Agreement.[6] Brown argues that Griffin's actions in ordering, delivering, and then removing inventory from his store as a result of a changed sales event was not fraudulent behavior. Verified Compl. ¶¶ 84-123. Brown also pled detailed facts that suggest Bimbo's purported basis to terminate the contract was pretext, and that the real reason was a personal grudge held against Griffin by one of Bimbo's managers. Id. at 43-55. Moreover, "fraud" is not defined by the Distribution Agreement, and the parties sharply dispute whether Brown and Griffin's actions constituted fraud or any other incurable breach. Again, Brown is not required to show any specific likelihood of success in order to survive a motion to dismiss - he need only allege facts that could plausibly state a claim for relief. Accordingly, because Brown has pled facts, taken as true, that his actions were not

---

[6] Bimbo does not explicitly challenge the sufficiency of Brown's pleadings as to the claim of breach of contract. However, because breach of contract is an element of specific performance, the court briefly addresses Brown's pleadings as to that issue.

15

fraudulent and that Bimbo did not terminate the contract on the basis of fraud, he has plausibly stated that Bimbo breached the Distribution Agreement.

**B.   Adequate Remedy at Law**

The closer question on Bimbo's Motion is whether Brown has pled facts which plausibly allege he will be unable to obtain an adequate remedy at law.  It is important to note again that this question is not assessed under the "clear showing" standard employed during the preliminary injunction analysis under Winter.  As reviewed in detail during those proceedings, preliminary injunctive relief is an extraordinary remedy, and requires a clear showing of irreparable harm.  Albeit limited by the expedited nature of the proceedings, this court did hear evidence including live testimony from Brown, Griffin, and Rosenbach - three key witnesses to the underlying merits.  Based on that testimony and the other evidence in the record, the court found that Brown had failed to clearly show he would succeed on the merits or suffer irreparable harm if the injunction was denied.  (ECF No. 25, at 27).  To survive a motion to dismiss, however, Brown is only required to plead facts, accepted as true by the court, that show an inadequate remedy at law is plausible.  This court finds that he has met this slight burden.

16

Pennsylvania law generally mirrors the common approach to specific performance. Unless there is an inadequate remedy at law, specific performance will be denied. See Allegheny, 171 F.3d at 160. But, where the subject matter of a contract is unique or such that its equivalent is not available on the open market, there is an inadequate remedy at law. Id. And under Pennsylvania law, courts have found that a business or business opportunity can be unique so as to conclude that monetary damages are an inadequate remedy. Id. ("[P]laintiff [has] the burden of showing with some particularity that the business . . . is either inherently unique or offers a unique opportunity to the buyer.").

In Allegheny, the Third Circuit decided whether a broken merger agreement between Allegheny Energy, Inc. and DQE, Inc. was a unique opportunity that warranted a grant of specific performance. 171 F.3d at 159. After laying out the standard requirements for specific performance under Pennsylvania law, the court highlighted cases in the Third Circuit and elsewhere which held some business transactions are so unique that money cannot adequately compensate when contracts are broken. Id. at 160-63. The court found that the complementing features between Allegheny and DEQ were such that a unique business opportunity existed in the merger and thus, specific performance was warranted. Id. at 163-64.

17

The factual circumstances in _Allegheny_ are admittedly different from the instant case. In _Allegheny_ the contractual breach was of a planned merger, while the alleged breach in this case was of an existing business relationship. However, the Third Circuit's reasoning applies to the type of relationship Brown has tried to allege. For example, the opinion referenced a Pennsylvania Supreme Court case, _Goldman v. McShain_, 247 A.2d 455 (Pa. 1968), where the court allowed a claim of specific enforcement to build a theater on leased property to proceed to trial. 247 A.2d at 461. The Pennsylvania Supreme Court would later acknowledge _Goldman_ as an appropriate circumstance for a claim of specific performance because it amounted to a "joint business venture" where "future business profits are of necessity speculative and difficult to determine." _Petry v. Tanglwood Lakes, Inc._, 522 A.2d 1053, 1056 n. 7 (Pa. 1986). Moreover, the Third Circuit explicitly noted that it was unable to find any instance where a Pennsylvania court found a business or business opportunity was not unique, which "militates against treating the plaintiff's burden [to show a business or opportunity is unique] as an onerous one." _Allegheny_, 171 F.3d at 163.

The legal principles invoked in _Allegheny_ are also present in more recent Pennsylvania cases. _See, e.g._, _York Group, Inc. v. Yorktowne Caskets, Inc._, 924 A.2d 1234 (Pa. Super. Ct. 2007).

18

In <u>York Group</u>, the Pennsylvania Superior Court found that "impending loss of business opportunity or market advantage may aptly be characterized as an 'irreparable injury.'" 924 A.2d at 1242 (quoting <u>Kessler v. Broder</u>, 851 A.2d 944, 951 (Pa. Super. Ct. 2004)). While <u>York Group</u> concerned the issuance of a preliminary injunction, "irreparable harm" exists where there is a risk of injury that "would not be adequately compensated by damages," making the substantive analysis identical to that of the third prong of specific performance. <u>See</u> 924 A.2d at 1242. Beyond Pennsylvania, as the Third Circuit highlighted, courts allow claims for specific performance to proceed where a business is allegedly unique. <u>See, e.g.</u>, <u>S.W.B. New England, Inc. v. R.A.B. Food Group, LLC</u>, No. 06 Civ. 15357, 2008 WL 540091 *1, *7 (S.D.N.Y. Feb. 27, 2008) (denying motion to dismiss claim for specific performance of distribution agreement because plaintiff plausibly alleged requisite facts to show business of selling kosher products was unique).

Having established that Pennsylvania law recognizes that certain businesses or business opportunities may be sufficiently particular or unique such that there is no adequate remedy at law to compensate for their loss, the question presented is whether Brown has pled facts which establish a plausible claim that his distributorship, or its future opportunities, fall within that class. This court finds that he has. Foremost is

19

Brown's allegation that the specific routes he acquired are unique and that "Bimbo's . . . termination of the Contract constitutes forfeiture of [Brown's] unique interest in the routes and will result in a cessation of his 20 plus year business." Verified Compl. ¶¶ 132, 136 (ECF No. 1-1). And while this explicit claim of uniqueness is not adequate standing alone, Brown continues that through termination of his longstanding business, he "will be denied extra-contractual opportunities such as the ability to expand his routes, add routes as he has historically done, and/or ultimately sell his routes at a time when he is ready to retire in a profitable and controlled manner." _Id._ at ¶ 139. He defends the existence of such "extra-contractual opportunities" by stating, for example, that he was "instrumental in establishing the Sara Lee brand in the Norfolk market" and was so successful at the business that "he was offered an opportunity to take over the Eastern Carolina sales area." _Id._ at ¶ 4. In reference to growing his business, Brown pled that he "has developed great customer relations and good will with companies . . . over the many years he has worked his routes." _Id._ at ¶ 9. And finally, that a forced sale of his distribution rights "will not garner the appropriate fair value of the business," because it cannot compensate for the time and effort he has put into building the business on these routes. See _id._ at ¶ 140.

20

The court is mindful - as set out in the recommendation against preliminary injunction - that routes very much like Brown's are bought and sold routinely.  And Brown's expressed devotion to a particular market may not preclude the application of his skills and assets to a different route or different manufacturer altogether.[7]  But Brown's factual allegations, which the court must accept as true and draw all reasonable inferences therefrom, state a plausible claim that his business presents unique opportunities and thus, the remedy of specific performance would be proper.  It is not appropriate at this stage for the court to determine whether or not Brown's business or any opportunities it may produce are, in fact, unique.  It is enough that the claim is facially plausible.  The likelihood that the court will make such a finding is irrelevant at this stage and beyond the scope of this court's review.  See Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556) ("The plausibility standard is not akin to a 'probability requirement,' . . . .").

Again, the applicable standard at this stage is far less onerous than the "clear showing" requirement employed by this

---

[7] The court has found cases that view long-standing businesses as difficult to measure monetarily because of the effort put in to build them, which lends support to the idea that Brown's efforts in cultivating these particular routes make them unique.  See e.g., Semmes Motors v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970) (granting temporary injunction to prevent impending loss of 20-year-old family-run car dealership).  However, those cases were decided in the Second Circuit and thus, are not controlling here.

21

court during the preliminary injunction determination. At the preliminary injunction stage, Brown had to <u>clearly</u> show that there was a <u>likelihood</u> he would succeed on the merits of his claim and <u>clearly</u> show that he would suffer irreparable harm if the court did not grant preliminary injunctive relief. <u>See</u> <u>Winter</u>, 555 U.S. at 24 (emphasis added). In other words, Brown was essentially required to show is was likely Bimbo had in fact breached the contract and, before the development of any evidence, that it was clear that his routes were unique such that monetary damages could not compensate for their loss. His burden at the preliminary injunction stage was difficult, and one that he failed to meet.

At the motion to dismiss stage, the court is required to accept his factual allegations as true and draw all reasonable inferences from those allegations. <u>See</u> <u>Iqbal</u>, 556 U.S. at 678. Having done so, this court finds that Brown has stated a plausible claim for specific performance of his Distribution Agreement. His factual allegations address the requisite elements - (1) that a contract existed, (2) that the contract was breached, and (3) that his business cannot be adequately compensated for by monetary damages. Because Brown has pled facts that plausibly establish a contract existed, it was breached, and that his business or related opportunities are unique such that there is no adequate remedy at law, he has met

his burden of stating a claim for specific performance under Pennsylvania law.

## IV. **RECOMMENDATION**

For the foregoing reasons, the court recommends that the Motion to Dismiss (ECF No. 15) be DENIED.

## V. **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.  Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.  A district judge shall make a _de novo_ determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433

23

(4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

October 4, 2016